310 F.3d 717
 In re: SEALED CASE
 No. 02-001.
 No. 02-002.
 United States Foreign Intelligence Surveillance Court of Review.
 Argued September 9, 2002.
 Decided November 18, 2002.
 
 COPYRIGHT MATERIAL OMITTED Theodore B. Olson, Solicitor General, argued the cause for appellant the United States, with whom John Ashcroft, Attorney General, Larry D. Thompson, Deputy Attorney General, David S. Kris, Associate Deputy Attorney General, James A. Baker, Counsel for Intelligence Policy, and Jonathan L. Marcus, Attorney Advisor, were on the briefs.
 Ann Beeson, Jameel Jaffer, Steven R. Shapiro, for amicus curiae American Civil Liberties Union, with whom James X. Dempsey for Center for Democracy and Technology, Kate Martin for Center for National Security Studies, David L. Sobel for Electronic Privacy Information Center, and Lee Tien for Electronic Frontier Foundation, were on the brief.
 John D. Cline, Zachary A. Ives, and Joshua Dratel, for amicus curiae National Association of Criminal Defense Lawyers.
 Before: GUY, Senior Circuit Judge, Presiding; SILBERMAN and LEAVY, Senior Circuit Judges.
 Opinion for the Court filed PER CURIAM.
 
 PER CURIAM:
 
 1
 This is the first appeal from the Foreign Intelligence Surveillance Court to the Court of Review since the passage of the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. §§ 1801-1862 (West 1991 and Supp.2002), in 1978. The appeal is brought by the United States from a FISA court surveillance order which imposed certain restrictions on the government. Since the government is the only party to FISA proceedings, we have accepted briefs filed by the American Civil Liberties Union (ACLU)[1] and the National Association of Criminal Defense Lawyers (NACDL) as amici curiae.
 
 
 2
 Not surprisingly this case raises important questions of statutory interpretation, and constitutionality. After a careful review of the briefs filed by the government and amici, we conclude that FISA, as amended by the Patriot Act,[2] supports the government's position, and that the restrictions imposed by the FISA court are not required by FISA or the Constitution. We therefore remand for further proceedings in accordance with this opinion.
 
 I.
 
 3
 The court's decision from which the government appeals imposed certain requirements and limitations accompanying an order authorizing electronic surveillance of an "agent of a foreign power" as defined in FISA. There is no disagreement between the government and the FISA court as to the propriety of the electronic surveillance; the court found that the government had shown probable cause to believe that the target is an agent of a foreign power and otherwise met the basic requirements of FISA. The government's application for a surveillance order contains detailed information to support its contention that the target, who is a United States person, is aiding, abetting, or conspiring with others in international terrorism.[ ][3]
 
 
 4
 The FISA court authorized the surveillance, but imposed certain restrictions, which the government contends are neither mandated nor authorized by FISA. Particularly, the court ordered that
 
 
 5
 law enforcement officials shall not make recommendations to intelligence officials concerning the initiation, operation, continuation or expansion of FISA searches or surveillances. Additionally, the FBI and the Criminal Division [of the Department of Justice] shall ensure that law enforcement officials do not direct or control the use of the FISA procedures to enhance criminal prosecution, and that advice intended to preserve the option of a criminal prosecution does not inadvertently result in the Criminal Division's directing or controlling the investigation using FISA searches and surveillances toward law enforcement objectives.
 
 
 6
 To ensure the Justice Department followed these strictures the court also fashioned what the government refers to as a "chaperone requirement"; that a unit of the Justice Department, the Office of Intelligence Policy and Review (OIPR) (composed of 31 lawyers and 25 support staff), "be invited" to all meetings between the FBI and the Criminal Division involving consultations for the purpose of coordinating efforts "to investigate or protect against foreign attack or other grave hostile acts, sabotage, international terrorism, or clandestine intelligence activities by foreign powers or their agents." If representatives of OIPR are unable to attend such meetings, "OIPR shall be apprized of the substance of the meetings forthwith in writing so that the Court may be notified at the earliest opportunity."
 
 
 7
 These restrictions are not original to the order appealed.[4] They were actually set forth in an opinion written by the former Presiding Judge of the FISA court on May 17 of this year. But since that opinion did not accompany an order conditioning an approval of an electronic surveillance application it was not appealed. It is, however, the basic decision before us and it is its rationale that the government challenges. The opinion was issued after an oral argument before all of the then-serving FISA district judges and clearly represents the views of all those judges.[5]
 
 
 8
 We think it fair to say, however, that the May 17 opinion of the FISA court does not clearly set forth the basis for its decision. It appears to proceed from the assumption that FISA constructed a barrier between counterintelligence/intelligence officials and law enforcement officers in the Executive Branch — indeed, it uses the word "wall" popularized by certain commentators (and journalists) to describe that supposed barrier.
 
 
 9
 The "wall" emerges from the court's implicit interpretation of FISA. The court apparently believes it can approve applications for electronic surveillance only if the government's objective is not primarily directed toward criminal prosecution of the foreign agents for their foreign intelligence activity. But the court neither refers to any FISA language supporting that view, nor does it reference the Patriot Act amendments, which the government contends specifically altered FISA to make clear that an application could be obtained even if criminal prosecution is the primary counter mechanism.
 
 
 10
 Instead the court relied for its imposition of the disputed restrictions on its statutory authority to approve "minimization procedures" designed to prevent the acquisition, retention, and dissemination within the government of material gathered in an electronic surveillance that is unnecessary to the government's need for foreign intelligence information. 50 U.S.C. § 1801(h).
 
 
 Jurisdiction
 
 
 11
 This court has authority "to review the denial of any application" under FISA. Id. § 1803(b). The FISA court's order is styled as a grant of the application "as modified." It seems obvious, however, that the FISA court's order actually denied the application to the extent it rejected a significant portion of the government's proposed minimization procedures and imposed restrictions on Department of Justice investigations that the government opposes. Indeed, the FISA court was clear in rejecting a portion of the application. Under these circumstances, we have jurisdiction to review the FISA court's order; to conclude otherwise would elevate form over substance and deprive the government of judicial review of the minimization procedures imposed by the FISA court. See Mobile Comm. Corp. v. FCC, 77 F.3d 1399, 1403-04 (D.C.Cir.) (grant of station license subject to condition that is unacceptable to applicant is subject to judicial review under statute that permits such review when application for license is denied), cert. denied, 519 U.S. 823, 117 S.Ct. 81, 136 L.Ed.2d 38 (1996).
 
 II.
 
 12
 The government makes two main arguments. The first, it must be noted, was not presented to the FISA court; indeed, insofar as we can determine it has never previously been advanced either before a court or Congress.[6] That argument is that the supposed pre-Patriot Act limitation in FISA that restricts the government's intention to use foreign intelligence information in criminal prosecutions is an illusion; it finds no support in either the language of FISA or its legislative history. The government does recognize that several courts of appeals, while upholding the use of FISA surveillances, have opined that FISA may be used only if the government's primary purpose in pursuing foreign intelligence information is not criminal prosecution, but the government argues that those decisions, which did not carefully analyze the statute, were incorrect in their statements, if not incorrect in their holdings.
 
 
 13
 Alternatively, the government contends that even if the primary purpose test was a legitimate construction of FISA prior to the passage of the Patriot Act, that Act's amendments to FISA eliminate that concept. And as a corollary, the government insists the FISA court's construction of the minimization procedures is far off the mark both because it is a misconstruction of those provisions per se, as well as an end run around the specific amendments in the Patriot Act designed to deal with the real issue underlying this case. The government, moreover, contends that the FISA court's restrictions, which the court described as minimization procedures, are so intrusive into the operation of the Department of Justice as to exceed the constitutional authority of Article III judges.
 
 
 14
 The government's brief, and its supplementary brief requested by this court, also set forth its view that the primary purpose test is not required by the Fourth Amendment. The ACLU and NACDL argue, inter alia, the contrary; that the statutes are unconstitutional unless they are construed as prohibiting the government from obtaining approval of an application under FISA if its "primary purpose" is criminal prosecution.
 
 
 The 1978 FISA
 
 
 15
 We turn first to the statute as enacted in 1978.[7] It authorizes a judge on the FISA court to grant an application for an order approving electronic surveillance to "obtain foreign intelligence information" if "there is probable cause to believe that ... the target of the electronic surveillance is a foreign power or an agent of a foreign power," and that "each of the facilities or places at which the surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power." 50 U.S.C. § 1805(a)(3). As is apparent, the definitions of agent of a foreign power and foreign intelligence information are crucial to an understanding of the statutory scheme.[8] The latter means
 
 
 16
 (1) information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against —
 
 
 17
 A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;
 
 
 18
 B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or
 
 
 19
 C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power.
 
 Id. § 1801(e)(1).[9]
 
 20
 The definition of an agent of a foreign power, if it pertains to a U.S. person (which is the only category relevant to this case), is closely tied to criminal activity. The term includes any person who "knowingly engages in clandestine intelligence gathering activities ... which activities involve or may involve a violation of the criminal statutes of the United States," or "knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor." Id. §§ 1801(b)(2)(A), (C) (emphasis added). International terrorism refers to activities that "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or any State." Id. § 1801(c)(1) (emphasis added). Sabotage means activities that "involve a violation of chapter 105 of [the criminal code], or that would involve such a violation if committed against the United States." Id. § 1801(d). For purposes of clarity in this opinion we will refer to the crimes referred to in section 1801(a)-(e) as foreign intelligence crimes.[10]
 
 
 21
 In light of these definitions, it is quite puzzling that the Justice Department, at some point during the 1980s, began to read the statute as limiting the Department's ability to obtain FISA orders if it intended to prosecute the targeted agents — even for foreign intelligence crimes. To be sure, section 1804, which sets forth the elements of an application for an order, required a national security official in the Executive Branch — typically the Director of the FBI — to certify that "the purpose" of the surveillance is to obtain foreign intelligence information (amended by the Patriot Act to read "a significant purpose"). But as the government now argues, the definition of foreign intelligence information includes evidence of crimes such as espionage, sabotage or terrorism. Indeed, it is virtually impossible to read the 1978 FISA to exclude from its purpose the prosecution of foreign intelligence crimes, most importantly because, as we have noted, the definition of an agent of a foreign power — if he or she is a U.S. person — is grounded on criminal conduct.
 
 
 22
 It does not seem that FISA, at least as originally enacted, even contemplated that the FISA court would inquire into the government's purpose in seeking foreign intelligence information. Section 1805, governing the standards a FISA court judge is to use in determining whether to grant a surveillance order, requires the judge to find that
 
 
 23
 the application which has been filed contains all statements and certifications required by section 1804 of this title and, if the target is a United States person, the certification or certifications are not clearly erroneous on the basis of the statement made under section 1804(a)(7)(E) of this title and any other information furnished under section 1804(d) of this title.
 
 
 24
 50 U.S.C. § 1805(a)(5).[11] And section 1804(a)(7)(E) requires that the application include "a statement of the basis of the certification that — (i) the information sought is the type of foreign intelligence information designated; and (ii) such information cannot reasonably be obtained by normal investigative techniques." That language certainly suggests that, aside from the probable cause, identification of facilities, and minimization procedures the judge is to determine and approve (also set forth in section 1805), the only other issues are whether electronic surveillance is necessary to obtain the information and whether the information sought is actually foreign intelligence information — not the government's proposed use of that information.[12]
 
 
 25
 Nor does the legislative history cast doubt on the obvious reading of the statutory language that foreign intelligence information includes evidence of foreign intelligence crimes. To the contrary, the House Report explained:
 
 
 26
 [T]he term "foreign intelligence information," especially as defined in subparagraphs (e)(1)(B) and (e)(1)(C), can include evidence of certain crimes relating to sabotage, international terrorism, or clandestine intelligence activities. With respect to information concerning U.S. persons, foreign intelligence information includes information necessary to protect against clandestine intelligence activities of foreign powers or their agents. Information about a spy's espionage activities obviously is within this definition, and it is most likely at the same time evidence of criminal activities.
 
 
 27
 H.R.REP. No. 95-1283 (hereinafter "H. REP.") at 49 (1978) (emphasis added).
 
 
 28
 The government argues persuasively that arresting and prosecuting terrorist agents of, or spies for, a foreign power may well be the best technique to prevent them from successfully continuing their terrorist or espionage activity. The government might wish to surveil the agent for some period of time to discover other participants in a conspiracy or to uncover a foreign power's plans, but typically at some point the government would wish to apprehend the agent and it might be that only a prosecution would provide sufficient incentives for the agent to cooperate with the government. Indeed, the threat of prosecution might be sufficient to "turn the agent." It would seem that the Congress actually anticipated the government's argument and explicitly approved it. The House Report said:
 
 
 29
 How this information may be used "to protect" against clandestine intelligence activities is not prescribed by the definition of foreign intelligence information, although, of course, how it is used may be affected by minimization procedures.... And no information acquired pursuant to this bill could be used for other than lawful purposes.... Obviously, use of "foreign intelligence information" as evidence in a criminal trial is one way the Government can lawfully protect against clandestine intelligence activities, sabotage, and international terrorism. The bill, therefore, explicitly recognizes that information which is evidence of crimes involving [these activities] can be sought, retained, and used pursuant to this bill.
 
 
 30
 Id. (emphasis added). The Senate Report is on all fours:
 
 
 31
 U.S. persons may be authorized targets, and the surveillance is part of an investigative process often designed to protect against the commission of serious crimes such as espionage, sabotage, assassination, kidnaping, and terrorist acts committed by or on behalf of foreign powers. Intelligence and criminal law enforcement tend to merge in this area.... [S]urveillances conducted under [FISA] need not stop once conclusive evidence of a crime is obtained, but instead may be extended longer where protective measures other than arrest and prosecution are more appropriate.
 
 
 32
 S.REP. No. 95-701 (hereinafter "S. REP.") at 10-11 (1978) (emphasis added).
 
 
 33
 Congress was concerned about the government's use of FISA surveillance to obtain information not truly intertwined with the government's efforts to protect against threats from foreign powers. Accordingly, the certification of purpose under section 1804(a)(7)(B) served to
 
 
 34
 prevent the practice of targeting, for example, a foreign power for electronic surveillance when the true purpose of the surveillance is to gather information about an individual for other than foreign intelligence purposes. It is also designed to make explicit that the sole purpose of such surveillance is to secure "foreign intelligence information," as defined, and not to obtain some other type of information.
 
 
 35
 H. REP. at 76; see also S. REP. at 51. But Congress did not impose any restrictions on the government's use of the foreign intelligence information to prosecute agents of foreign powers for foreign intelligence crimes. Admittedly, the House, at least in one statement, noted that FISA surveillances "are not primarily for the purpose of gathering evidence of a crime. They are to obtain foreign intelligence information, which when it concerns United States persons must be necessary to important national concerns." H. REP. at 36. That, however, was an observation, not a proscription. And the House as well as the Senate made clear that prosecution is one way to combat foreign intelligence crimes. See id.; S. REP. at 10-11.
 
 
 36
 The origin of what the government refers to as the false dichotomy between foreign intelligence information that is evidence of foreign intelligence crimes and that which is not appears to have been a Fourth Circuit case decided in 1980. United States v. Truong Dinh Hung, 629 F.2d 908 (4th Cir.1980). That case, however, involved an electronic surveillance carried out prior to the passage of FISA and predicated on the President's executive power. In approving the district court's exclusion of evidence obtained through a warrantless surveillance subsequent to the point in time when the government's investigation became "primarily" driven by law enforcement objectives, the court held that the Executive Branch should be excused from securing a warrant only when "the object of the search or the surveillance is a foreign power, its agents or collaborators," and "the surveillance is conducted `primarily' for foreign intelligence reasons." Id. at 915. Targets must "receive the protection of the warrant requirement if the government is primarily attempting to put together a criminal prosecution." Id. at 916. Although the Truong court acknowledged that "almost all foreign intelligence investigations are in part criminal" ones, it rejected the government's assertion that "if surveillance is to any degree directed at gathering foreign intelligence, the executive may ignore the warrant requirement of the Fourth Amendment." Id. at 915.
 
 
 37
 Several circuits have followed Truong in applying similar versions of the "primary purpose" test, despite the fact that Truong was not a FISA decision. (It was an interpretation of the Constitution, in the context of measuring the boundaries of the President's inherent executive authority, and we discuss Truong's constitutional analysis at length in Section III of this opinion.) In one of the first major challenges to a FISA search, United States v. Megahey, 553 F.Supp. 1180 (E.D.N.Y. 1982), aff'd sub nom. United States v. Duggan, 743 F.2d 59 (2d Cir.1984), the district court acknowledged that while Congress clearly viewed arrest and prosecution as one of the possible outcomes of a FISA investigation, surveillance under FISA would nevertheless be "appropriate only if foreign intelligence surveillance is the Government's primary purpose." Id. at 1189-90. Six months earlier, another judge in the same district had held that the Truong analysis did not govern FISA cases, since a FISA order was a warrant that met Fourth Amendment standards. United States v. Falvey, 540 F.Supp. 1306, 1314 (E.D.N.Y.1982). Falvey, however, was apparently not appealed and Megahey was. The Second Circuit, without reference to Falvey, and importantly in the context of affirming the conviction, approved Megahey's finding that the surveillance was not "directed towards criminal investigation or the institution of a criminal prosecution." Duggan, 743 F.2d at 78 (quoting Megahey, 553 F.Supp. at 1190). Implicitly then, the Second Circuit endorsed the Megahey dichotomy. Two other circuits, the Fourth and the Eleventh, have similarly approved district court findings that a surveillance was primarily for foreign intelligence purposes without any discussion — or need to discuss — the validity of the dichotomy. See United States v. Pelton, 835 F.2d 1067, 1075-76 (4th Cir.1987), cert. denied, 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988); United States v. Badia, 827 F.2d 1458, 1464 (11th Cir.1987), cert. denied, 485 U.S. 937, 108 S.Ct. 1115, 99 L.Ed.2d 275 (1988).
 
 
 38
 Then, the First Circuit, seeing Duggan as following Truong, explicitly interpreted FISA's purpose wording in section 1804(a)(7)(B) to mean that "[a]lthough evidence obtained under FISA subsequently may be used in criminal prosecutions, the investigation of criminal activity cannot be the primary purpose of the surveillance." United States v. Johnson, 952 F.2d 565, 572 (1st Cir.1991) (citations omitted), cert. denied, 506 U.S. 816, 113 S.Ct. 58, 121 L.Ed.2d 27 (1992). Notably, however, the Ninth Circuit has refused
 
 
 39
 to draw too fine a distinction between criminal and intelligence investigations. "International terrorism," by definition, requires the investigation of activities that constitute crimes. That the government may later choose to prosecute is irrelevant.... FISA is meant to take into account "[t]he differences between ordinary criminal investigations to gather evidence of specific crimes and foreign counterintelligence investigations to uncover and monitor clandestine activities...."
 
 
 40
 United States v. Sarkissian, 841 F.2d 959, 964 (9th Cir.1988) (citations omitted).
 
 
 41
 Neither Duggan nor Johnson tied the "primary purpose" test to actual statutory language. In Duggan the court stated that "[t]he requirement that foreign intelligence information be the primary objective of the surveillance is plain," and the district court was correct in "finding that `the purpose of the surveillance in this case, both initially and throughout, was to secure foreign intelligence information and was not, as [the] defendants assert, directed towards criminal investigation or the institution of a criminal prosecution.'" Duggan, 743 F.2d at 77-78 (quoting Megahey, 553 F.Supp. at 1190).[13] Yet the court never explained why it apparently read foreign intelligence information to exclude evidence of crimes — endorsing the district court's implied dichotomy — when the statute's definitions of foreign intelligence and foreign agent are actually cast in terms of criminal conduct. (It will be recalled that the type of foreign intelligence with which we are concerned is really counterintelligence, see supra note 9.) And Johnson did not even focus on the phrase "foreign intelligence information" in its interpretation of the "purpose" language in section 1804(a)(7)(B). Johnson, 952 F.2d at 572.
 
 
 42
 It is almost as if Duggan, and particularly Johnson, assume that the government seeks foreign intelligence information (counterintelligence) for its own sake — to expand its pool of knowledge — because there is no discussion of how the government would use that information outside criminal prosecutions. That is not to say that the government could have no other use for that information. The government's overriding concern is to stop or frustrate the agent's or the foreign power's activity by any means, but if one considers the actual ways in which the government would foil espionage or terrorism it becomes apparent that criminal prosecution analytically cannot be placed easily in a separate response category. It may well be that the government itself, in an effort to conform to district court holdings, accepted the dichotomy it now contends is false. Be that as it may, since the cases that "adopt" the dichotomy do affirm district court opinions permitting the introduction of evidence gathered under a FISA order, there was not much need for the courts to focus on the issue with which we are confronted.
 
 
 43
 In sum, we think that the FISA as passed by Congress in 1978 clearly did not preclude or limit the government's use or proposed use of foreign intelligence information, which included evidence of certain kinds of criminal activity, in a criminal prosecution. In order to understand the FISA court's decision, however, it is necessary to trace developments and understandings within the Justice Department post-Truong as well as after the passage of the Patriot Act. As we have noted, some time in the 1980s — the exact moment is shrouded in historical mist — the Department applied the Truong analysis to an interpretation of the FISA statute. What is clear is that in 1995 the Attorney General adopted "Procedures for Contacts Between the FBI and the Criminal Division Concerning Foreign Intelligence and Foreign Counterintelligence Investigations."
 
 
 44
 Apparently to avoid running afoul of the primary purpose test used by some courts, the 1995 Procedures limited contacts between the FBI and the Criminal Division in cases where FISA surveillance or searches were being conducted by the FBI for foreign intelligence (FI) or foreign counterintelligence (FCI) purposes.[14] The procedures state that "the FBI and Criminal Division should ensure that advice intended to preserve the option of a criminal prosecution does not inadvertently result in either the fact or the appearance of the Criminal Division's directing or controlling the FI or FCI investigation toward law enforcement objectives." 1995 Procedures at 2, ¶ 6 (emphasis added). Although these procedures provided for significant information sharing and coordination between criminal and FI or FCI investigations, based at least in part on the "directing or controlling" language, they eventually came to be narrowly interpreted within the Department of Justice, and most particularly by OIPR, as requiring OIPR to act as a "wall" to prevent the FBI intelligence officials from communicating with the Criminal Division regarding ongoing FI or FCI investigations. See Final Report of the Attorney General's Review Team on the Handling of the Los Alamos National Laboratory Investigation (AGRT Report), Chapter 20 at 721-34 (May 2000). Thus, the focus became the nature of the underlying investigation, rather than the general purpose of the surveillance. Once prosecution of the target was being considered, the procedures, as interpreted by OIPR in light of the case law, prevented the Criminal Division from providing any meaningful advice to the FBI. Id.
 
 
 45
 The Department's attitude changed somewhat after the May 2000 report by the Attorney General and a July 2001 Report by the General Accounting Office both concluded that the Department's concern over how the FISA court or other federal courts might interpret the primary purpose test has inhibited necessary coordination between intelligence and law enforcement officials. See id. at 721-34;[15] General Accounting Office, FBI Intelligence Investigations: Coordination Within Justice on Counterintelligence Criminal Matters is Limited (July 2001) (GAO-01-780) (GAO Report) at 3. The AGRT Report also concluded, based on the text of FISA and its legislative history, that not only should the purpose of the investigation not be inquired into by the courts, but also that Congress affirmatively anticipated that the underlying investigation might well have a criminal as well as foreign counterintelligence objective. AGRT Report at 737. In response to the AGRT Report, the Attorney General, in January 2000, issued additional, interim procedures designed to address coordination problems identified in that report. In August 2001, the Deputy Attorney General issued a memorandum clarifying Department of Justice policy governing intelligence sharing and establishing additional requirements. (These actions, however, did not replace the 1995 Procedures.) But it does not appear that the Department thought of these internal procedures as "minimization procedures" required under FISA.[16] Nevertheless, the FISA court was aware that the procedures were being followed by the Department and apparently adopted elements of them in certain cases.
 
 
 46
 
 The Patriot Act and the FISA Court's Decision
 
 
 
 47
 The passage of the Patriot Act altered and to some degree muddied the landscape. In October 2001, Congress amended FISA to change "the purpose" language in 1804(a)(7)(B) to "a significant purpose." It also added a provision allowing "Federal officers who conduct electronic surveillance to acquire foreign intelligence information" to "consult with Federal law enforcement officers to coordinate efforts to investigate or protect against" attack or other grave hostile acts, sabotage or international terrorism, or clandestine intelligence activities, by foreign powers or their agents. 50 U.S.C. § 1806(k)(1). And such coordination "shall not preclude" the government's certification that a significant purpose of the surveillance is to obtain foreign intelligence information, or the issuance of an order authorizing the surveillance. Id. § 1806(k)(2). Although the Patriot Act amendments to FISA expressly sanctioned consultation and coordination between intelligence and law enforcement officials, in response to the first applications filed by OIPR under those amendments, in November 2001, the FISA court for the first time adopted the 1995 Procedures, as augmented by the January 2000 and August 2001 Procedures, as "minimization procedures" to apply in all cases before the court.[17]
 
 
 48
 The Attorney General interpreted the Patriot Act quite differently. On March 6, 2002, the Attorney General approved new "Intelligence Sharing Procedures" to implement the Act's amendments to FISA. The 2002 Procedures supersede prior procedures and were designed to permit the complete exchange of information and advice between intelligence and law enforcement officials. They eliminated the "direction and control" test and allowed the exchange of advice between the FBI, OIPR, and the Criminal Division regarding "the initiation, operation, continuation, or expansion of FISA searches or surveillance." On March 7, 2002, the government filed a motion with the FISA court, noting that the Department of Justice had adopted the 2002 Procedures and proposing to follow those procedures in all matters before the court. The government also asked the FISA court to vacate its orders adopting the prior procedures as minimization procedures in all cases and imposing special "wall" procedures in certain cases.
 
 
 49
 Unpersuaded by the Attorney General's interpretation of the Patriot Act, the court ordered that the 2002 Procedures be adopted, with modifications, as minimization procedures to apply in all cases. The court emphasized that the definition of minimization procedures had not been amended by the Patriot Act, and reasoned that the 2002 Procedures "cannot be used by the government to amend the Act in ways Congress has not." The court explained:
 
 
 50
 Given our experience in FISA surveillances and searches, we find that these provisions in sections II.B and III [of the 2002 Procedures], particularly those which authorize criminal prosecutors to advise FBI intelligence officials on the initiation, operation, continuation or expansion of FISA's intrusive seizures, are designed to enhance the acquisition, retention and dissemination of evidence for law enforcement purposes, instead of being consistent with the need of the United States to "obtain, produce, and disseminate foreign intelligence information"... as mandated in § 1801(h) and § 1821(4).
 
 
 51
 May 17, 2001 Opinion at 22 (emphasis added by the FISA court).[18] The FISA court also adopted a new rule of court procedure, Rule 11, which provides that "[a]ll FISA applications shall include informative descriptions of any ongoing criminal investigations of FISA targets, as well as the substance of any consultations between the FBI and criminal prosecutors at the Department of Justice or a United States Attorney's Office."
 
 
 52
 Undeterred, the government submitted the application at issue in this appeal on July 19, 2002, and expressly proposed using the 2002 Procedures without modification. In an order issued the same day, the FISA judge hearing the application granted an order for surveillance of the target but modified the 2002 Procedures consistent with the court's May 17, 2002 en banc order. It is the July 19, 2002 order that the government appeals, along with an October 17, 2002 order granting, with the same modifications as the July 19 order, the government's application for renewal of the surveillance in this case. Because those orders incorporate the May 17, 2002 order and opinion by reference, however, that order and opinion are before us as well.
 
 
 53
 * * * *
 
 
 54
 Essentially, the FISA court took portions of the Attorney General's augmented 1995 Procedures — adopted to deal with the primary purpose standard — and imposed them generically as minimization procedures. In doing so, the FISA court erred. It did not provide any constitutional basis for its action — we think there is none — and misconstrued the main statutory provision on which it relied. The court mistakenly categorized the augmented 1995 Procedures as FISA minimization procedures and then compelled the government to utilize a modified version of those procedures in a way that is clearly inconsistent with the statutory purpose.
 
 
 55
 Under section 1805 of FISA, "the judge shall enter an ex parte order as requested or as modified approving the electronic surveillance if he finds that ... the proposed minimization procedures meet the definition of minimization procedures under section 1801(h) of this title." 50 U.S.C. § 1805(a)(4). The statute defines minimization procedures in pertinent part as:
 
 
 56
 (1) specific procedures, which shall be adopted by the Attorney General, that are reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information;
 
 
 57
 (2) procedures that require that nonpublicly available information, which is not foreign intelligence information, as defined in subsection (e)(1) of this section, shall not be disseminated in a manner that identifies any United States person, without such person's consent, unless such person's identity is necessary to understand foreign intelligence information or assess its importance.
 
 
 58
 Section 1801(h) also contains the following proviso:
 
 
 59
 (3) notwithstanding paragraphs (1) and (2), procedures that allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes....
 
 
 60
 Id. § 1801(h).
 
 
 61
 As is evident from the face of section 1801(h), minimization procedures are designed to protect, as far as reasonable, against the acquisition, retention, and dissemination of nonpublic information which is not foreign intelligence information. If the data is not foreign intelligence information as defined by the statute, the procedures are to ensure that the government does not use the information to identify the target or third party, unless such identification is necessary to properly understand or assess the foreign intelligence information that is collected. Id. § 1801(h)(2). By minimizing acquisition, Congress envisioned that, for example, "where a switchboard line is tapped but only one person in the organization is the target, the interception should probably be discontinued where the target is not a party" to the communication. H. REP. at 55-56. By minimizing retention, Congress intended that "information acquired, which is not necessary for obtaining[,] producing, or disseminating foreign intelligence information, be destroyed where feasible." H. REP. at 56. Furthermore, "[e]ven with respect to information needed for an approved purpose, dissemination should be restricted to those officials with a need for such information." Id. (emphasis added).
 
 
 62
 The minimization procedures allow, however, the retention and dissemination of non-foreign intelligence information which is evidence of ordinary crimes for preventative or prosecutorial purposes. See 50 U.S.C. § 1801(h)(3). Therefore, if through interceptions or searches, evidence of "a serious crime totally unrelated to intelligence matters" is incidentally acquired, the evidence is "not ... required to be destroyed." H. REP. at 62 (emphasis added). As we have explained, under the 1978 Act, "evidence of certain crimes like espionage would itself constitute `foreign intelligence information,' as defined, because it is necessary to protect against clandestine intelligence activities by foreign powers or their agents." H. REP. at 62; see also id. at 49. In light of these purposes of the minimization procedures, there is simply no basis for the FISA court's reliance on section 1801(h) to limit criminal prosecutors' ability to advise FBI intelligence officials on the initiation, operation, continuation, or expansion of FISA surveillances to obtain foreign intelligence information, even if such information includes evidence of a foreign intelligence crime.
 
 
 63
 The FISA court's decision and order not only misinterpreted and misapplied minimization procedures it was entitled to impose, but as the government argues persuasively, the FISA court may well have exceeded the constitutional bounds that restrict an Article III court. The FISA court asserted authority to govern the internal organization and investigative procedures of the Department of Justice which are the province of the Executive Branch (Article II) and the Congress (Article I). Subject to statutes dealing with the organization of the Justice Department, however, the Attorney General has the responsibility to determine how to deploy personnel resources. As the Supreme Court said in Morrison v. Olson in cautioning the Special Division of the D.C. Circuit to avoid unauthorized administrative guidance of Independent Counsel, "[t]he gradual expansion of the authority of the Special Division might in another context be a bureaucratic success story, but it would be one that would have serious constitutional ramifications." 487 U.S. 654, 684, 108 S.Ct. 2597, 2615, 101 L.Ed.2d 569 (1988).[19]
 
 
 64
 * * * *
 
 
 65
 We also think the refusal by the FISA court to consider the legal significance of the Patriot Act's crucial amendments was error. The government, in order to avoid the requirement of meeting the "primary purpose" test, specifically sought an amendment to section 1804(a)(7)(B) which had required a certification "that the purpose of the surveillance is to obtain foreign intelligence information" so as to delete the article "the" before "purpose" and replace it with "a." The government made perfectly clear to Congress why it sought the legislative change. Congress, although accepting the government's explanation for the need for the amendment, adopted language which it perceived as not giving the government quite the degree of modification it wanted. Accordingly, section 1804(a)(7)(B)'s wording became "that a significant purpose of the surveillance is to obtain foreign intelligence information" (emphasis added). There is simply no question, however, that Congress was keenly aware that this amendment relaxed a requirement that the government show that its primary purpose was other than criminal prosecution.
 
 
 66
 No committee reports accompanied the Patriot Act but the floor statements make congressional intent quite apparent. The Senate Judiciary Committee Chairman Senator Leahy acknowledged that "[p]rotection against these foreign-based threats by any lawful means is within the scope of the definition of `foreign intelligence information,' and the use of FISA to gather evidence for the enforcement of these laws was contemplated in the enactment of FISA." 147 Cong. Rec. S11004 (Oct. 25, 2001). "This bill ... break[s] down traditional barriers between law enforcement and foreign intelligence. This is not done just to combat international terrorism, but for any criminal investigation that overlaps a broad definition of `foreign intelligence.'" 147 Cong. Rec. S10992 (Oct. 25, 2001) (statement of Sen. Leahy). And Senator Feinstein, a "strong support[er]," was also explicit. The ultimate objective was to make it
 
 
 67
 easier to collect foreign intelligence information under the Foreign Intelligence Surveillance Act, FISA. Under current law, authorities can proceed with surveillance under FISA only if the primary purpose of the investigation is to collect foreign intelligence.
 
 
 68
 But in today's world things are not so simple. In many cases, surveillance will have two key goals — the gathering of foreign intelligence, and the gathering of evidence for a criminal prosecution. Determining which purpose is the "primary" purpose of the investigation can be difficult, and will only become more so as we coordinate our intelligence and law enforcement efforts in the war against terror.
 
 
 69
 Rather than forcing law enforcement to decide which purpose is primary — law enforcement or foreign intelligence gathering, this bill strikes a new balance. It will now require that a "significant" purpose of the investigation must be foreign intelligence gathering to proceed with surveillance under FISA.
 
 
 70
 The effect of this provision will be to make it easier for law enforcement to obtain a FISA search or surveillance warrant for those cases where the subject of the surveillance is both a potential source of valuable intelligence and the potential target of a criminal prosecution. Many of the individuals involved in supporting the September 11 attacks may well fall into both of these categories.
 
 
 71
 147 Cong. Rec. S10591 (Oct. 11, 2001).
 
 
 72
 To be sure, some Senate Judiciary Committee members including the Chairman were concerned that the amendment might grant too much authority to the Justice Department — and the FISA court. Senator Leahy indicated that the change to significant purpose was "very problematic" since it would "make it easier for the FBI to use a FISA wiretap to obtain information where the Government's most important motivation for the wiretap is for use in a criminal prosecution." 147 Cong. Rec. S10593 (Oct. 11, 2001). Therefore he suggested that "it will be up to the courts to determine how far law enforcement agencies may use FISA for criminal investigation and prosecution beyond the scope of the statutory definition of `foreign intelligence information.'" 147 Cong. Rec. S11004 (Oct. 25, 2001) (emphasis added). But the only dissenting vote against the act was cast by Senator Feingold. For the Record: Senate Votes, 59 CONG. QUARTERLY (WKLY.) 39, Oct. 13, 2001, at 2425. Senator Feingold recognized that the change to "significant purpose" meant that the government could obtain a FISA warrant "even if the primary purpose is a criminal investigation," and was concerned that this development would not respect the protections of the Fourth Amendment. 147 Cong. Rec. S11021 (Oct. 25, 2001).
 
 
 73
 In sum, there can be no doubt as to Congress' intent in amending section 1804(a)(7)(B). Indeed, it went further to emphasize its purpose in breaking down barriers between criminal law enforcement and intelligence (or counterintelligence) gathering by adding section 1806(k):
 
 
 74
 (k) Consultation with Federal law enforcement officer
 
 
 75
 (1) Federal officers who conduct electronic surveillance to acquire foreign intelligence information under this title may consult with Federal law enforcement officers to coordinate efforts to investigate or protect against
 
 
 76
 (A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power; or
 
 
 77
 (B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or
 
 
 78
 (C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power.
 
 
 79
 (2) Coordination authorized under paragraph (1) shall not preclude the certification required by section [1804](a)(7)(B) of this title or the entry of an order under section [1805] of this title.
 
 
 80
 The FISA court noted this amendment but thought that Congress' approval of consultations was not equivalent to authorizing law enforcement officers to give advice to officers who were conducting electronic surveillance nor did it sanction law enforcement officers "directing or controlling" surveillances. However, dictionary definitions of "consult" include giving advice. See, e.g., OXFORD ENGLISH DICTIONARY ONLINE (2d ed.1989). Beyond that, when Congress explicitly authorizes consultation and coordination between different offices in the government, without even suggesting a limitation on who is to direct and control, it necessarily implies that either could be taking the lead.
 
 
 81
 Neither amicus brief defends the reasoning of the FISA court. NACDL's brief makes no attempt to interpret FISA or the Patriot Act amendments but rather argues the primary purpose test is constitutionally compelled. The ACLU relies on Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522, to interpret FISA, passed 10 years later. That technique, to put it gently, is hardly an orthodox method of statutory interpretation. FISA was passed to deal specifically with the subject of foreign intelligence surveillance. The ACLU does argue that Congress' intent to preclude law enforcement officials initiating or controlling foreign intelligence investigations is revealed by FISA's exclusion of the Attorney General — a law enforcement official — from the officers who can certify the foreign intelligence purpose of an application under section 1804. The difficulty with that argument is that the Attorney General supervises the Director of the FBI who is both a law enforcement and counterintelligence officer. The Attorney General or the Deputy Attorney General, moreover, must approve all applications no matter who certifies that the information sought is foreign intelligence information. 50 U.S.C. § 1804(a).[20]
 
 
 82
 The ACLU insists that the significant purpose amendment only "clarified" the law permitting FISA surveillance orders "even if foreign intelligence is not its exclusive purpose" (emphasis added). In support of this rather strained interpretation, which ignores the legislative history of the Patriot Act, the ACLU relies on a September 10, 2002 hearing of the Judiciary Committee (the day after the government's oral presentation to this court) at which certain senators made statements — somewhat at odds with their floor statements prior to the passage of the Patriot Act — as to what they had intended the year before. The D.C. Circuit has described such post-enactment legislative statements as "legislative future" rather than legislative history, not entitled to authoritative weight. See General Instrument Corp. v. FCC, 213 F.3d 724, 733 (D.C.Cir.2000).
 
 
 83
 Accordingly, the Patriot Act amendments clearly disapprove the primary purpose test. And as a matter of straightforward logic, if a FISA application can be granted even if "foreign intelligence" is only a significant — not a primary — purpose, another purpose can be primary. One other legitimate purpose that could exist is to prosecute a target for a foreign intelligence crime. We therefore believe the Patriot Act amply supports the government's alternative argument but, paradoxically, the Patriot Act would seem to conflict with the government's first argument because by using the term "significant purpose," the Act now implies that another purpose is to be distinguished from a foreign intelligence purpose.
 
 
 84
 The government heroically tries to give the amended section 1804(a)(7)(B) a wholly benign interpretation. It concedes that "the `significant purpose' amendment recognizes the existence of the dichotomy between foreign intelligence and law enforcement," but it contends that "it cannot be said to recognize (or approve) its legitimacy." Supp. Br. of U.S. at 25 (emphasis in original). We are not persuaded. The very letter the Justice Department sent to the Judiciary Committee in 2001 defending the constitutionality of the significant purpose language implicitly accepted as legitimate the dichotomy in FISA that the government now claims (and we agree) was false. It said, "it is also clear that while FISA states that `the' purpose of a search is for foreign surveillance, that need not be the only purpose. Rather, law enforcement considerations can be taken into account, so long as the surveillance also has a legitimate foreign intelligence purpose." The senatorial statements explaining the significant purpose amendments which we described above are all based on the same understanding of FISA which the Justice Department accepted — at least until this appeal. In short, even though we agree that the original FISA did not contemplate the "false dichotomy," the Patriot Act actually did — which makes it no longer false. The addition of the word "significant" to section 1804(a)(7)(B) imposed a requirement that the government have a measurable foreign intelligence purpose, other than just criminal prosecution of even foreign intelligence crimes. Although section 1805(a)(5), as we discussed above, may well have been intended to authorize the FISA court to review only the question whether the information sought was a type of foreign intelligence information, in light of the significant purpose amendment of section 1804 it seems section 1805 must be interpreted as giving the FISA court the authority to review the government's purpose in seeking the information.
 
 
 85
 That leaves us with something of an analytic conundrum. On the one hand, Congress did not amend the definition of foreign intelligence information which, we have explained, includes evidence of foreign intelligence crimes. On the other hand, Congress accepted the dichotomy between foreign intelligence and law enforcement by adopting the significant purpose test. Nevertheless, it is our task to do our best to read the statute to honor congressional intent. The better reading, it seems to us, excludes from the purpose of gaining foreign intelligence information a sole objective of criminal prosecution. We therefore reject the government's argument to the contrary. Yet this may not make much practical difference. Because, as the government points out, when it commences an electronic surveillance of a foreign agent, typically it will not have decided whether to prosecute the agent (whatever may be the subjective intent of the investigators or lawyers who initiate an investigation). So long as the government entertains a realistic option of dealing with the agent other than through criminal prosecution, it satisfies the significant purpose test.
 
 
 86
 The important point is — and here we agree with the government — the Patriot Act amendment, by using the word "significant," eliminated any justification for the FISA court to balance the relative weight the government places on criminal prosecution as compared to other counterintelligence responses. If the certification of the application's purpose articulates a broader objective than criminal prosecution — such as stopping an ongoing conspiracy — and includes other potential non-prosecutorial responses, the government meets the statutory test. Of course, if the court concluded that the government's sole objective was merely to gain evidence of past criminal conduct — even foreign intelligence crimes — to punish the agent rather than halt ongoing espionage or terrorist activity, the application should be denied.
 
 
 87
 The government claims that even prosecutions of non-foreign intelligence crimes are consistent with a purpose of gaining foreign intelligence information so long as the government's objective is to stop espionage or terrorism by putting an agent of a foreign power in prison. That interpretation transgresses the original FISA. It will be recalled that Congress intended section 1804(a)(7)(B) to prevent the government from targeting a foreign agent when its "true purpose" was to gain non-foreign intelligence information — such as evidence of ordinary crimes or scandals. See supra at p. 725. (If the government inadvertently came upon evidence of ordinary crimes, FISA provided for the transmission of that evidence to the proper authority. 50 U.S.C. § 1801(h)(3).) It can be argued, however, that by providing that an application is to be granted if the government has only a "significant purpose" of gaining foreign intelligence information, the Patriot Act allows the government to have a primary objective of prosecuting an agent for a non-foreign intelligence crime. Yet we think that would be an anomalous reading of the amendment. For we see not the slightest indication that Congress meant to give that power to the Executive Branch. Accordingly, the manifestation of such a purpose, it seems to us, would continue to disqualify an application. That is not to deny that ordinary crimes might be inextricably intertwined with foreign intelligence crimes. For example, if a group of international terrorists were to engage in bank robberies in order to finance the manufacture of a bomb, evidence of the bank robbery should be treated just as evidence of the terrorist act itself. But the FISA process cannot be used as a device to investigate wholly unrelated ordinary crimes.
 
 
 88
 One final point; we think the government's purpose as set forth in a section 1804(a)(7)(B) certification is to be judged by the national security official's articulation and not by a FISA court inquiry into the origins of an investigation nor an examination of the personnel involved. It is up to the Director of the FBI, who typically certifies, to determine the government's national security purpose, as approved by the Attorney General or Deputy Attorney General. This is not a standard whose application the FISA court legitimately reviews by seeking to inquire into which Justice Department officials were instigators of an investigation. All Justice Department officers — including those in the FBI — are under the control of the Attorney General. If he wishes a particular investigation to be run by an officer of any division, that is his prerogative. There is nothing in FISA or the Patriot Act that suggests otherwise. That means, perforce, if the FISA court has reason to doubt that the government has any real non-prosecutorial purpose in seeking foreign intelligence information it can demand further inquiry into the certifying officer's purpose — or perhaps even the Attorney General's or Deputy Attorney General's reasons for approval. The important point is that the relevant purpose is that of those senior officials in the Executive Branch who have the responsibility of appraising the government's national security needs.
 
 III.
 
 89
 Having determined that FISA, as amended, does not oblige the government to demonstrate to the FISA court that its primary purpose in conducting electronic surveillance is not criminal prosecution, we are obliged to consider whether the statute as amended is consistent with the Fourth Amendment. The Fourth Amendment provides:
 
 
 90
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 
 
 91
 Although the FISA court did not explicitly rely on the Fourth Amendment, it at least suggested that this provision was the animating principle driving its statutory analysis. The FISA court indicated that its disapproval of the Attorney General's 2002 Procedures was based on the need to safeguard the "privacy of Americans in these highly intrusive surveillances and searches," which implies the invocation of the Fourth Amendment. The government, recognizing the Fourth Amendment's shadow effect on the FISA court's opinion, has affirmatively argued that FISA is constitutional. And some of the very senators who fashioned the Patriot Act amendments expected that the federal courts, including presumably the FISA court, would carefully consider that question. Senator Leahy believed that "[n]o matter what statutory change is made ... the court may impose a constitutional requirement of `primary purpose' based on the appellate court decisions upholding FISA against constitutional challenges over the past 20 years." 147 Cong. Rec. S11003 (Oct. 25, 2001). Senator Edwards stated that "the FISA court will still need to be careful to enter FISA orders only when the requirements of the Constitution as well as the statute are satisfied." 147 Cong. Rec. S10589 (Oct. 11, 2001).
 
 
 92
 We are, therefore, grateful to the ACLU and NACDL for their briefs that vigorously contest the government's argument. Both NACDL (which, as we have noted above, presents only the argument that the statute as amended is unconstitutional) and the ACLU rely on two propositions. The first is not actually argued; it is really an assumption — that a FISA order does not qualify as a warrant within the meaning of the Fourth Amendment. The second is that any government surveillance whose primary purpose is criminal prosecution of whatever kind is per se unreasonable if not based on a warrant.
 
 
 93
 The FISA court expressed concern that unless FISA were "construed" in the fashion that it did, the government could use a FISA order as an improper substitute for an ordinary criminal warrant under Title III. That concern seems to suggest that the FISA court thought Title III procedures are constitutionally mandated if the government has a prosecutorial objective regarding an agent of a foreign power. But in United States v. United States District Court (Keith), 407 U.S. 297, 322, 92 S.Ct. 2125, 2139, 32 L.Ed.2d 752 (1972) — in which the Supreme Court explicitly declined to consider foreign intelligence surveillance — the Court indicated that, even with respect to domestic national security intelligence gathering for prosecutorial purposes where a warrant was mandated, Title III procedures were not constitutionally required: "[W]e do not hold that the same type of standards and procedures prescribed by Title III are necessarily applicable to this case. We recognize that domestic security surveillance may involve different policy and practical considerations from the surveillance of `ordinary crime.'" Nevertheless, in asking whether FISA procedures can be regarded as reasonable under the Fourth Amendment, we think it is instructive to compare those procedures and requirements with their Title III counterparts. Obviously, the closer those FISA procedures are to Title III procedures, the lesser are our constitutional concerns.
 
 
 94
 
 Comparison of FISA Procedures with Title III
 
 
 
 95
 It is important to note that while many of FISA's requirements for a surveillance order differ from those in Title III, few of those differences have any constitutional relevance. In the context of ordinary crime, beyond requiring searches and seizures to be reasonable, the Supreme Court has interpreted the warrant clause of the Fourth Amendment to require three elements:
 
 
 96
 First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction" for a particular offense. Finally, "warrants must particularly describe the `things to be seized,'" as well as the place to be searched.
 
 
 97
 Dalia v. United States, 441 U.S. 238, 255, 99 S.Ct. 1682, 1692, 60 L.Ed.2d 177 (1979) (citations omitted).
 
 
 98
 With limited exceptions not at issue here, both Title III and FISA require prior judicial scrutiny of an application for an order authorizing electronic surveillance. 50 U.S.C. § 1805; 18 U.S.C. § 2518. And there is no dispute that a FISA judge satisfies the Fourth Amendment's requirement of a "neutral and detached magistrate." See United States v. Cavanagh, 807 F.2d 787, 790 (9th Cir.1987) (FISA court is a "detached and neutral body"); see also Keith, 407 U.S. at 323, 92 S.Ct. at 2139-40 (in domestic national security context, suggesting that a request for prior court authorization could, in sensitive cases, be made to any member of a specially designated court).
 
 
 99
 The statutes differ to some extent in their probable cause showings. Title III allows a court to enter an ex parte order authorizing electronic surveillance if it determines on the basis of the facts submitted in the government's application that "there is probable cause for belief that an individual is committing, has committed, or is about to commit" a specified predicate offense. 18 U.S.C. § 2518(3)(a). FISA by contrast requires a showing of probable cause that the target is a foreign power or an agent of a foreign power. 50 U.S.C. § 1805(a)(3). We have noted, however, that where a U.S. person is involved, an "agent of a foreign power" is defined in terms of criminal activity.[21] Admittedly, the definition of one category of U.S.-person agents of foreign powers — that is, persons engaged in espionage and clandestine intelligence activities for a foreign power — does not necessarily require a showing of an imminent violation of criminal law. See 50 U.S.C. § 1801(b)(2)(A) (defining such activities as those which "involve" or "may involve" a violation of criminal statutes of the United States). Congress clearly intended a lesser showing of probable cause for these activities than that applicable to ordinary criminal cases. See H. REP. at 39-40, 79. And with good reason — these activities present the type of threats contemplated by the Supreme Court in Keith when it recognized that the focus of security surveillance "may be less precise than that directed against more conventional types of crime" even in the area of domestic threats to national security. Keith, 407 U.S. at 322, 92 S.Ct. at 2139. Congress was aware of Keith's reasoning, and recognized that it applies a fortiori to foreign threats. See S. REP. at 15. As the House Report notes with respect to clandestine intelligence activities:
 
 
 100
 The term "may involve" not only requires less information regarding the crime involved, but also permits electronic surveillance at some point prior to the time when a crime sought to be prevented, as for example, the transfer of classified documents, actually occurs.
 
 
 101
 H. REP. at 40. Congress allowed this lesser showing for clandestine intelligence activities — but not, notably, for other activities, including terrorism — because it was fully aware that such foreign intelligence crimes may be particularly difficult to detect.[22] At the same time, however, it provided another safeguard not present in Title III — that is, the requirement that there be probable cause to believe the target is acting "for or on behalf of a foreign power." Under the definition of "agent of a foreign power" FISA surveillance could not be authorized
 
 
 102
 against an American reporter merely because he gathers information for publication in a newspaper, even if the information was classified by the Government. Nor would it be authorized against a Government employee or former employee who reveals secrets to a reporter or in a book for the purpose of informing the American people. This definition would not authorize surveillance of ethnic Americans who lawfully gather political information and perhaps even lawfully share it with the foreign government of their national origin. It obviously would not apply to lawful activities to lobby, influence, or inform Members of Congress or the administration to take certain positions with respect to foreign or domestic concerns. Nor would it apply to lawful gathering of information preparatory to such lawful activities.
 
 
 103
 H. REP. at 40. Similarly, FISA surveillance would not be authorized against a target engaged in purely domestic terrorism because the government would not be able to show that the target is acting for or on behalf of a foreign power. As should be clear from the foregoing, FISA applies only to certain carefully delineated, and particularly serious, foreign threats to national security.
 
 
 104
 Turning then to the first of the particularity requirements, while Title III requires probable cause to believe that particular communications concerning the specified crime will be obtained through the interception, 18 U.S.C. § 2518(3)(b), FISA instead requires an official to designate the type of foreign intelligence information being sought, and to certify that the information sought is foreign intelligence information. When the target is a U.S. person, the FISA judge reviews the certification for clear error, but this "standard of review is not, of course, comparable to a probable cause finding by the judge." H. REP. at 80. Nevertheless, FISA provides additional protections to ensure that only pertinent information is sought. The certification must be made by a national security officer — typically the FBI Director — and must be approved by the Attorney General or the Attorney General's Deputy. Congress recognized that this certification would "assure[] written accountability within the Executive Branch" and provide "an internal check on Executive Branch arbitrariness." H. REP. at 80. In addition, the court may require the government to submit any further information it deems necessary to determine whether or not the certification is clearly erroneous. See 50 U.S.C. § 1804(d).
 
 
 105
 With respect to the second element of particularity, although Title III generally requires probable cause to believe that the facilities subject to surveillance are being used or are about to be used in connection with the commission of a crime or are leased to, listed in the name of, or used by the individual committing the crime, 18 U.S.C. § 2518(3)(d), FISA requires probable cause to believe that each of the facilities or places at which the surveillance is directed is being used, or is about to be used, by a foreign power or agent. 50 U.S.C. § 1805(a)(3)(B). In cases where the targeted facilities are not leased to, listed in the name of, or used by the individual committing the crime, Title III requires the government to show a nexus between the facilities and communications regarding the criminal offense. The government does not have to show, however, anything about the target of the surveillance; it is enough that "an individual" — not necessarily the target — is committing a crime. 18 U.S.C. §§ 2518(3)(a), (d); see United States v. Kahn, 415 U.S. 143, 157, 94 S.Ct. 977, 985, 39 L.Ed.2d 225 (1974) ("when there is probable cause to believe that a particular telephone is being used to commit an offense but no particular person is identifiable, a wire interception order may, nevertheless, properly issue under [Title III]"). On the other hand, FISA requires probable cause to believe the target is an agent of a foreign power (that is, the individual committing a foreign intelligence crime) who uses or is about to use the targeted facility. Simply put, FISA requires less of a nexus between the facility and the pertinent communications than Title III, but more of a nexus between the target and the pertinent communications. See H. REP. at 73 ("the target of a surveillance is the individual or entity or about whom or from whom information is sought").
 
 
 106
 There are other elements of Title III that at least some circuits have determined are constitutionally significant — that is, necessity, duration of surveillance, and minimization. See, e.g., United States v. Falls, 34 F.3d 674, 680 (8th Cir.1994). Both statutes have a "necessity" provision, which requires the court to find that the information sought is not available through normal investigative procedures. See 18 U.S.C. § 2518(3)(c); 50 U.S.C. §§ 1804(a)(7)(E)(ii), 1805(a)(5). Although the court's clearly erroneous review under FISA is more limited than under Title III, this greater deference must be viewed in light of FISA's additional requirement that the certification of necessity come from an upper level Executive Branch official. The statutes also have duration provisions; Title III orders may last up to 30 days, 18 U.S.C. § 2518(5), while FISA orders may last up to 90 days for U.S. persons. 50 U.S.C. § 1805(e)(1). This difference is based on the nature of national security surveillance, which is "often long range and involves the interrelation of various sources and types of information." Keith, 407 U.S. at 322, 92 S.Ct. at 2139; see also S. REP. at 16, 56. Moreover, the longer surveillance period is balanced by continuing FISA court oversight of minimization procedures during that period. 50 U.S.C. § 1805(e)(3); see also S. REP. at 56. And where Title III requires minimization of what is acquired,[23] as we have discussed, for U.S. persons, FISA requires minimization of what is acquired, retained, and disseminated. The FISA court notes, however, that in practice FISA surveillance devices are normally left on continuously, and the minimization occurs in the process of indexing and logging the pertinent communications. The reasonableness of this approach depends on the facts and circumstances of each case. Scott v. United States, 436 U.S. 128, 140-43, 98 S.Ct. 1717, 1724-26, 56 L.Ed.2d 168 (1978) (acquisition of virtually all conversations was reasonable under the circumstances). Less minimization in the acquisition stage may well be justified to the extent the intercepted communications are "ambiguous in nature or apparently involve[] guarded or coded language," or "the investigation is focusing on what is thought to be a widespread conspiracy [where] more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." Id. at 140. Given the targets of FISA surveillance, it will often be the case that intercepted communications will be in code or a foreign language for which there is no contemporaneously available translator, and the activities of foreign agents will involve multiple actors and complex plots. [ ]
 
 
 107
 Amici particularly focus on the differences between the two statutes concerning notice.[24] Title III requires notice to the target (and, within the discretion of the judge, to other persons whose communications were intercepted) once the surveillance order expires. 18 U.S.C. § 2518(8)(d). FISA does not require notice to a person whose communications were intercepted unless the government "intends to enter into evidence or otherwise use or disclose" such communications in a trial or other enumerated official proceedings. 50 U.S.C. § 1806(c). As the government points out, however, to the extent evidence obtained through a FISA surveillance order is used in a criminal proceeding, notice to the defendant is required. Of course, where such evidence is not ultimately going to be used for law enforcement, Congress observed that "[t]he need to preserve secrecy for sensitive counterintelligence sources and methods justifies elimination of the notice requirement." S. REP. at 12.
 
 
 108
 Based on the foregoing, it should be evident that while Title III contains some protections that are not in FISA, in many significant respects the two statutes are equivalent, and in some, FISA contains additional protections.[25] Still, to the extent the two statutes diverge in constitutionally relevant areas — in particular, in their probable cause and particularity showings — a FISA order may not be a "warrant" contemplated by the Fourth Amendment. The government itself does not actually claim that it is, instead noting only that there is authority for the proposition that a FISA order is a warrant in the constitutional sense. See Cavanagh, 807 F.2d at 790 (concluding that FISA order can be considered a warrant since it is issued by a detached judicial officer and is based on a reasonable showing of probable cause); see also Pelton, 835 F.2d at 1075 (joining Cavanagh in holding that FISA procedures meet constitutional requirements); Falvey, 540 F.Supp. at 1314 (holding that unlike in Truong, a congressionally crafted warrant that met Fourth Amendment standards was obtained authorizing the surveillance). We do not decide the issue but note that to the extent a FISA order comes close to meeting Title III, that certainly bears on its reasonableness under the Fourth Amendment.
 
 
 109
 
 Did Truong Articulate the Appropriate Constitutional Standard?
 
 
 
 110
 Ultimately, the question becomes whether FISA, as amended by the Patriot Act, is a reasonable response based on a balance of the legitimate need of the government for foreign intelligence information to protect against national security threats with the protected rights of citizens. Cf. Keith, 407 U.S. at 322-23, 92 S.Ct. at 2139 (in domestic security context, holding that standards different from those in Title III "may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of the government for intelligence information and the protected rights of our citizens"). To answer that question — whether the Patriot Act's disavowal of the primary purpose test is constitutional — besides comparing the FISA procedures with Title III, it is necessary to consider carefully the underlying rationale of the primary purpose test.
 
 
 111
 It will be recalled that the case that set forth the primary purpose test as constitutionally required was Truong. The Fourth Circuit thought that Keith's balancing standard implied the adoption of the primary purpose test. We reiterate that Truong dealt with a pre-FISA surveillance based on the President's constitutional responsibility to conduct the foreign affairs of the United States. 629 F.2d at 914. Although Truong suggested the line it drew was a constitutional minimum that would apply to a FISA surveillance, see id. at 914 n. 4, it had no occasion to consider the application of the statute carefully. The Truong court, as did all the other courts to have decided the issue, held that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information.[26] It was incumbent upon the court, therefore, to determine the boundaries of that constitutional authority in the case before it. We take for granted that the President does have that authority and, assuming that is so, FISA could not encroach on the President's constitutional power. The question before us is the reverse, does FISA amplify the President's power by providing a mechanism that at least approaches a classic warrant and which therefore supports the government's contention that FISA searches are constitutionally reasonable.
 
 
 112
 The district court in the Truong case had excluded evidence obtained from electronic surveillance after the government's investigation — the court found — had converted from one conducted for foreign intelligence reasons to one conducted primarily as a criminal investigation. (The defendants were convicted based in part on surveillance evidence gathered before that point.) The district judge had focused on the date that the Criminal Division had taken a central role in the investigation. The court of appeals endorsed that approach stating:
 
 
 113
 We think that the district court adopted the proper test, because once surveillance becomes primarily a criminal investigation, the courts are entirely competent to make the usual probable cause determination, and because, importantly, individual privacy interests come to the fore and government foreign policy concerns recede when the government is primarily attempting to form the basis of a criminal prosecution.
 
 
 114
 Id. at 915 (emphasis added).
 
 
 115
 That analysis, in our view, rested on a false premise and the line the court sought to draw was inherently unstable, unrealistic, and confusing. The false premise was the assertion that once the government moves to criminal prosecution, its "foreign policy concerns" recede. As we have discussed in the first part of the opinion, that is simply not true as it relates to counterintelligence. In that field the government's primary purpose is to halt the espionage or terrorism efforts, and criminal prosecutions can be, and usually are, interrelated with other techniques used to frustrate a foreign power's efforts. Indeed, the Fourth Circuit itself, rejecting defendant's arguments that it should adopt a "solely foreign intelligence purpose test," acknowledged that "almost all foreign intelligence investigations are in part criminal investigations." Id. (It would have been more accurate to refer to counterintelligence investigations.)
 
 
 116
 The method the court endorsed for determining when an investigation became primarily criminal was based on the organizational structure of the Justice Department. The court determined an investigation became primarily criminal when the Criminal Division played a lead role. This approach has led, over time, to the quite intrusive organizational and personnel tasking the FISA court adopted. Putting aside the impropriety of an Article III court imposing such organizational strictures (which we have already discussed), the line the Truong court adopted-subsequently referred to as a "wall" — was unstable because it generates dangerous confusion and creates perverse organizational incentives. See, e.g., AGRT Report at 723-26.[27] That is so because counterintelligence brings to bear both classic criminal investigation techniques as well as less focused intelligence gathering. Indeed, effective counterintelligence, we have learned, requires the wholehearted cooperation of all the government's personnel who can be brought to the task. A standard which punishes such cooperation could well be thought dangerous to national security.[28] Moreover, by focusing on the subjective motivation of those who initiate investigations, the Truong standard, as administered by the FISA court, could be thought to discourage desirable initiatives. (It is also at odds with the Supreme Court's Fourth Amendment jurisprudence which regards the subjective motivation of an officer conducting a search or seizure as irrelevant. See, e.g., Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).)
 
 
 117
 Recent testimony before the Joint Intelligence Committee amply demonstrates that the Truong line is a very difficult one to administer. Indeed, it was suggested that the FISA court requirements based on Truong may well have contributed, whether correctly understood or not, to the FBI missing opportunities to anticipate the September 11, 2001 attacks.[29] That is not to say that we should be prepared to jettison Fourth Amendment requirements in the interest of national security. Rather, assuming arguendo that FISA orders are not Fourth Amendment warrants, the question becomes, are the searches constitutionally reasonable. And in judging reasonableness, the instability of the Truong line is a relevant consideration.
 
 
 118
 The Fourth Circuit recognized that the Supreme Court had never considered the constitutionality of warrantless government searches for foreign intelligence reasons, but concluded the analytic framework the Supreme Court adopted in Keith — in the case of domestic intelligence surveillance — pointed the way to the line the Fourth Circuit drew. The Court in Keith had, indeed, balanced the government's interest against individual privacy interests, which is undoubtedly the key to this issue as well; but we think the Truong court misconceived the government's interest and, moreover, did not draw a more appropriate distinction that Keith at least suggested. That is the line drawn in the original FISA statute itself between ordinary crimes and foreign intelligence crimes.
 
 
 119
 It will be recalled that Keith carefully avoided the issue of a warrantless foreign intelligence search: "We have not addressed, and express no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents." 407 U.S. at 321-22, 92 S.Ct. at 2139.[30] But in indicating that a somewhat more relaxed warrant could suffice in the domestic intelligence situation, the court drew a distinction between the crime involved in that case, which posed a threat to national security, and "ordinary crime." Id. at 322, 92 S.Ct. at 2139. It pointed out that "the focus of domestic surveillance may be less precise than that directed against more conventional types of crimes." Id.
 
 
 120
 The main purpose of ordinary criminal law is twofold: to punish the wrongdoer and to deter other persons in society from embarking on the same course. The government's concern with respect to foreign intelligence crimes, on the other hand, is overwhelmingly to stop or frustrate the immediate criminal activity. As we discussed in the first section of this opinion, the criminal process is often used as part of an integrated effort to counter the malign efforts of a foreign power. Punishment of the terrorist or espionage agent is really a secondary objective;[31] indeed, punishment of a terrorist is often a moot point.
 
 
 Supreme Court's Special Needs Cases
 
 
 121
 The distinction between ordinary criminal prosecutions and extraordinary situations underlies the Supreme Court's approval of entirely warrantless and even suspicionless searches that are designed to serve the government's "special needs, beyond the normal need for law enforcement." Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 653, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564 (1995) (quoting Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) (internal quotation marks omitted)) (random drug-testing of student athletes).[32] Apprehending drunk drivers and securing the border constitute such unique interests beyond ordinary, general law enforcement. Id. at 654, 115 S.Ct. at 2391 (citing Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), and United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)).
 
 
 122
 A recent case, City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), is relied on by both the government and amici. In that case, the Court held that a highway check point designed to catch drug dealers did not fit within its special needs exception because the government's "primary purpose" was merely "to uncover evidence of ordinary criminal wrongdoing." Id. at 41-42, 121 S.Ct. at 454. The Court rejected the government's argument that the "severe and intractable nature of the drug problem" was sufficient justification for such a dragnet seizure lacking any individualized suspicion. Id. at 42, 121 S.Ct. at 454. Amici particularly rely on the Court's statement that "the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." Id.
 
 
 123
 But by "purpose" the Court makes clear it was referring not to a subjective intent, which is not relevant in ordinary Fourth Amendment probable cause analysis, but rather to a programmatic purpose. The Court distinguished the prior check point cases Martinez-Fuerte (involving checkpoints less than 100 miles from the Mexican border) and Sitz (checkpoints to detect intoxicated motorists) on the ground that the former involved the government's "longstanding concern for the protection of the integrity of the border," id. at 38, 121 S.Ct. at 452 (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985)), and the latter was "aimed at reducing the immediate hazard posed by the presence of drunk drivers on the highways." Id. at 39, 121 S.Ct. at 453. The Court emphasized that it was decidedly not drawing a distinction between suspicionless seizures with a "non-law-enforcement primary purpose" and those designed for law enforcement. Id. at 44 n. 1, 121 S.Ct. at 455 n. 1. Rather, the Court distinguished general crime control programs and those that have another particular purpose, such as protection of citizens against special hazards or protection of our borders. The Court specifically acknowledged that an appropriately tailored road block could be used "to thwart an imminent terrorist attack." Id. at 44, 121 S.Ct. at 455. The nature of the "emergency," which is simply another word for threat, takes the matter out of the realm of ordinary crime control.[33]
 
 
 Conclusion
 
 
 124
 FISA's general programmatic purpose, to protect the nation against terrorists and espionage threats directed by foreign powers, has from its outset been distinguishable from "ordinary crime control." After the events of September 11, 2001, though, it is hard to imagine greater emergencies facing Americans than those experienced on that date.
 
 
 125
 We acknowledge, however, that the constitutional question presented by this case — whether Congress' disapproval of the primary purpose test is consistent with the Fourth Amendment — has no definitive jurisprudential answer. The Supreme Court's special needs cases involve random stops (seizures) not electronic searches. In one sense, they can be thought of as a greater encroachment into personal privacy because they are not based on any particular suspicion. On the other hand, wiretapping is a good deal more intrusive than an automobile stop accompanied by questioning.
 
 
 126
 Although the Court in City of Indianapolis cautioned that the threat to society is not dispositive in determining whether a search or seizure is reasonable, it certainly remains a crucial factor. Our case may well involve the most serious threat our country faces. Even without taking into account the President's inherent constitutional authority to conduct warrantless foreign intelligence surveillance, we think the procedures and government showings required under FISA, if they do not meet the minimum Fourth Amendment warrant standards, certainly come close. We, therefore, believe firmly, applying the balancing test drawn from Keith, that FISA as amended is constitutional because the surveillances it authorizes are reasonable.
 
 
 127
 Accordingly, we reverse the FISA court's orders in this case to the extent they imposed conditions on the grant of the government's applications, vacate the FISA court's Rule 11, and remand with instructions to grant the applications as submitted and proceed henceforth in accordance with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Joining the ACLU on its brief are the Center for Democracy and Technology, Center for National Security Studies, Electronic Privacy Information Center, and Electronic Frontier Foundation
 
 
 [2]
 Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub.L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001)
 
 
 [3]
 The bracketed information is classified and has been redacted from the public version of the opinion
 
 
 [4]
 To be precise, there are two surveillance orders on appeal, one renewing the other with identical conditions
 
 
 [5]
 The argument before all of the district judges, some of whose terms have since expired, was referred to as an "en banc" although the statute does not contemplate such a proceeding. In fact, it specifically provides that if one judge declines to approve an application the government may not seek approval from another district judge, but only appeal to the Court of Review. 50 U.S.C. §§ 1803(a), (b)
 
 
 [6]
 Since proceedings before the FISA court and the Court of Review areex parte — not adversary — we can entertain an argument supporting the government's position not presented to the lower court.
 
 
 [7]
 As originally enacted, FISA covered only electronic surveillance. It was amended in 1994 to cover physical searches. Pub.L. No. 103-359, 108 Stat. 3444 (Oct. 14, 1994). Although only electronic surveillance is at issue here, much of our statutory analysis applies to FISA's provisions regarding physical searches, 50 U.S.C. §§ 1821-1829, which mirror to a great extent those regarding electronic surveillance
 
 
 [8]
 Foreign power is defined broadly to include,inter alia, "a group engaged in international terrorism or activities in preparation therefor" and "a foreign-based political organization, not substantially composed of United States persons." 50 U.S.C. §§ 1801(a)(4), (5).
 
 
 [9]
 A second definition of foreign intelligence information includes information necessary to "the national defense or the security of the United States," or "the conduct of the foreign affairs of the United States." 50 U.S.C. § 1801(e)(2). This definition generally involves information referred to as "affirmative" or "positive" foreign intelligence information rather than the "protective" or "counterintelligence" information at issue here
 
 
 [10]
 Under the current version of FISA, the definition of "agent of a foreign power" also includes U.S. persons who enter the United States under a false or fraudulent identity for or on behalf of a foreign power. Our term "foreign intelligence crimes" includes this fraudulent conduct, which will almost always involve a crime
 
 
 [11]
 Section 1804(d) simply provides that "[t]he judge may require the applicant to furnish such other information as may be necessary to make the determinations required by section 1805 of this title."
 
 
 [12]
 At oral argument before the FISA judges, the court asked government counsel whether a companion provision of FISA, section 1822(c), that gives the courtjurisdiction over physical searches "for the purpose of obtaining foreign intelligence information," obliged the court to consider the government's "primary purpose." We think that language points in the opposite direction since it would be more than a little strange for Congress to require a court to make a searching inquiry into the investigative background of a FISA application before concluding the court had jurisdiction over the application.
 
 
 [13]
 Interestingly, the court noted that theFISA judge "is not to second guess the Executive Branch official's certification that the objective of the surveillance is foreign intelligence information." Duggan, 743 F.2d at 77.
 
 
 [14]
 We certainly understand the 1995 Justice Department's effort to avoid difficulty with the FISA court, or other courts; and we have no basis to criticize any organization of the Justice Department that an Attorney General desires
 
 
 [15]
 According to the Report, within the Department the primary proponent of procedures that cordoned off criminal investigators and prosecutors from those officers with counterintelligence responsibilities was the deputy counsel of OIPRSee AGRT Report at 714 & n.949. He was subsequently transferred from that position and made a senior counsel. He left the Department and became the Legal Advisor to the FISA court.
 
 
 [16]
 There are other detailed, classified procedures governing the acquisition, retention, and dissemination of foreign intelligence and non-foreign intelligence information that have been submitted to and approved by the FISA court as "minimization procedures." Those classified minimization procedures are not at issue here
 
 
 [17]
 In particular, the court adopted Part A of the 1995 Procedures, which covers "Contacts During an FI or FCI Investigation in which FISA Surveillance or Searches are being Conducted." The remainder of the 1995 Procedures addresses contacts in cases where FISA is not at issue
 
 
 [18]
 In describing its experience with FISA searches and surveillance, the FISA court's opinion makes reference to certain applications each of which contained an FBI agent's affidavit that was inaccurate, particularly with respect to assertions regarding the information shared with criminal investigators and prosecutors. Although we do not approve any misrepresentations that may have taken place, our understanding is that those affidavits were submitted during 1997 through early 2001, and therefore any inaccuracies may have been caused in part by the confusion within the Department of Justice over implementation of the 1995 Procedures, as augmented in January 2000. In any event, while the issue of the candor of the FBI agent(s) involved properly remains under investigation by the Department of Justice's Office of Professional Responsibility, the issue whether the wall between the FBI and the Criminal Division required by the FISA court has been maintained is moot in light of this court's opinion
 
 
 [19]
 In light ofMorrison v. Olson and Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), we do not think there is much left to an argument made by an opponent of FISA in 1978 that the statutory responsibilities of the FISA court are inconsistent with Article III case and controversy responsibilities of federal judges because of the secret, non-adversary process. See Foreign Intelligence Electronic Surveillance: Hearings on H.R. 5794, 9745, 7308, and 5632 Before the Subcomm. on Legislation of the Permanent Select Comm. on Intelligence, 95th Cong., 2d Sess. 221 (1978) (statement of Laurence H. Silberman).
 
 
 [20]
 Furthermore, the Attorney General or Deputy Attorney General must approve the use in a criminal proceeding of information acquired pursuant to FISA. 50 U.S.C. § 1806(b)
 
 
 [21]
 The term "foreign power," which is not directly at issue in this case, is not defined solely in terms of criminal activity. For example, although the term includes a group engaged in international terrorism, which would involve criminal activity, it also includes any foreign government. 50 U.S.C. § 1801(a)(1)
 
 
 [22]
 For example, a federal agent may witness a "meet" or "drop" where information is being passed but be unable to determine precisely what information is being transmitted and therefore be unable to show that a crime is involved or what specific crime is being committedSee H. REP. at 39-40; see also S. REP. at 23.
 
 
 [23]
 Title III requires agents to conduct surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5)
 
 
 [24]
 Amici also emphasize that Title III generally entities a defendant to obtain the surveillance application and order to challenge to the legality of the surveillance, 18 U.S.C. § 2518(9), while FISA does not normally allow a defendant to obtain the same if the Attorney General states that disclosure or an adversary hearing would harm national security, 50 U.S.C. § 1806(f). Under such circumstances, the judge conducts an in camera and ex parte review to determine whether the electronic surveillance was lawful, whether disclosure or discovery is necessary, and whether to grant a motion to suppress. Id. §§ 1806(f), (g). Clearly, the decision whether to allow a defendant to obtain FISA materials is made by a district judge on a case by case basis, and the issue whether such a decision protects a defendant's constitutional rights in any given case is not before us.
 
 
 [25]
 In addition to the protections already discussed, FISA has more extensive reporting requirements than Title III,compare 18 U.S.C. § 2519(2) with 50 U.S.C. § 1808(a)(1), and is subject to close and continuing oversight by Congress as a check against Executive Branch abuses. S. REP. at 11-12. Also, the Patriot Act contains sunset provisions, see Section 224(a) of Patriot Act, Pub.L. 107-56, 115 Stat. 272 (Oct. 26, 2001), thus allowing Congress to revisit the Act's amendments to FISA.
 
 
 [26]
 Although the plurality opinion inZweibon v. Mitchell, 516 F.2d 594, 633-51 (D.C.Cir. 1975) (en banc), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 1685, 48 L.Ed.2d 187 (1976), suggested the contrary in dicta, it did not decide the issue.
 
 
 [27]
 We are told that the FBI has even thought it necessary because of FISA court rulings to pass off a criminal investigation to another government department when the FBI was conducting a companion counterintelligence inquiry
 
 
 [28]
 The AGRT Report bears this out: "Unfortunately, the practice of excluding the Criminal Division from FCI investigations was not an isolated event confined to the Wen Ho Lee matter. It has been a way of doing business for OIPR, acquiesced in by the FBI, and inexplicably indulged by the Department of Justice. One FBI supervisor has said that it has only been `lucky' that a case has not yet been hampered by the rigid interpretation of the rules governing contacts with the Criminal Division. It may be said that in the Wen Ho Lee investigation, luck ran out."Id. at 708 (citation omitted).
 
 
 [29]
 An FBI agent recently testified that efforts to conduct a criminal investigation of two of the alleged hijackers were blocked by senior FBI officials — understandably concerned about prior FISA court criticism — who interpreted that court's decisions as precluding a criminal investigator's role. One agent, frustrated at encountering the "wall," wrote to headquarters: "[S]omeday someone will die — and wall or not — the public will not understand why we were not more effective and throwing every resource we had at certain `problems.' Let's hope the National Security Law Unit will stand behind their decisions then, especially since the biggest threat to us now, [Usama Bin Laden], is getting the most `protection.'" The agent was told in response that headquarters was frustrated with the issue, but that those were the rules, and the National Security Law Unit does not make them upThe Malaysia Hijacking and September 11th: Joint Hearing Before the Senate and House Select Intelligence Committees (Sept. 20, 2002) (written statement of New York special agent of the FBI).
 
 
 [30]
 The Court in a footnote though, cited authority for the view that warrantless surveillance may be constitutional where foreign powers are involvedKeith, 407 U.S. at 322 n. 20, 92 S.Ct. at 2139 n. 20.
 
 
 [31]
 To be sure, punishment of a U.S. person's espionage for a foreign power does have a deterrent effect on others similarly situated
 
 
 [32]
 The Court has also allowed searches for certain administrative purposes to be undertaken without particularized suspicion of misconductSee, e.g., New York v. Burger, 482 U.S. 691, 702-04, 107 S.Ct. 2636, 2643-45, 96 L.Ed.2d 601 (1987) (warrantless administrative inspection of premises of closely regulated business); Camara v. Municipal Court, 387 U.S. 523, 534-39, 87 S.Ct. 1727, 1733-34, 18 L.Ed.2d 930 (1967) (administrative inspection to ensure compliance with city housing code).
 
 
 [33]
 Amici rely on Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), in arguing that the "special needs" cases acknowledge that the Fourth Amendment is particularly concerned with intrusions whose primary purpose is to gather evidence of crime. In that case, the Court struck down a non-consensual policy of testing obstetrics patients for drug use. The Court stated that "[w]hile the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off of drugs, the immediate objective of the searches was to generate evidence for law enforcement purposes in order to reach that goal." Id. at 82-83, 121 S.Ct. at 1291 (emphasis in original; footnotes omitted). In distinguishing the "special needs" cases, the Court noted that "[i]t is especially difficult to argue that the program here was designed simply to save lives," in light of evidence that the sort of program at issue actually discouraged women from seeking prenatal care. Id. at 84 n. 23, 121 S.Ct. at 1292 n. 23. Thus, Ferguson does not involve a situation in which law enforcement is directly connected to the prevention of a special harm.